148 P.3d 458 (2006)
In the Interest of C.R.C., a Child,
Upon the Petition of Yardeshia Wilford, Petitioner-Appellant, and
Concerning Sydney Coleman, Respondent, and
Michael Coleman, Appellee.
No. 05CA2468.
Colorado Court of Appeals, Div. III.
October 19, 2006.
*459 Jana Purdy, Lakewood, Colorado, for Petitioner-Appellant.
Holden Law Office, PLLC, Leta R. Holden, Denver, Colorado, for Appellee.
Opinion by Judge GRAHAM.
In this allocation of parental responsibilities proceeding, Yardeshia Wilford (mother) appeals from the permanent orders allocating parental responsibilities between her and Michael Coleman (great-uncle). We reverse and remand with directions to enter a new order allocating parental responsibilities entirely to mother.
Mother and Sydney Coleman, also known as Devarow Drake or Sydney Drake (father), are the parents of one child, born in April 2000. Until July 2002, mother and the child lived "off and on" with father. When they were not living with him, they lived with mother's mother (grandmother) in Houston, Texas.
When the child was approximately one year old, father was incarcerated. When he went to jail, his uncle (the child's great-uncle) and a female companion came to Texas at father's request and returned to Denver with mother and the child. Mother remained with them for a month or two. When father was released, she and the child returned to Texas with him.
In July 2002, mother entered the Job Corps program to obtain her G.E.D. and acquire job skills. She was stationed in a location which is four or five hours from Houston. Because she could not afford to travel to Houston for vacation or holiday leave, she was able to remain in contact with her family only by telephone. During her absence, the child was left in the care of father and grandmother. When father stopped taking the child to grandmother's home for care, mother believed that father had taken the child to Minneapolis to visit a daughter who lived there.
However, father had been given a twenty-year prison sentence for a drug offense, and in December 2002 he was taken into custody and advised to call someone to care for the child to avoid involving Child Protective Services. Father called a girlfriend to take the child, and then called great-uncle to ask him to come to Texas to get the child from the girlfriend. Great-uncle did not notify either mother or grandmother that he was taking the child to Denver. He testified that he did not know where to find either of them.
Great-uncle also testified that he and the child's parents had agreed before mother entered the Job Corps program that he *460 would care for the child while mother completed the program. Mother denied this. She testified that any such agreement had been an agreement between father and great-uncle alone, and that they had entered into it without her consent.
In January 2003, mother learned that the child had been taken by father's girlfriend. She left the Job Corps, called the police, and went to the girlfriend's home to retrieve him. However, the child had already been removed by great-uncle.
After removing the child to Colorado, father and great-uncle took steps to legitimize great-uncle's possession of him. In January 2003, father signed a power of attorney naming great-uncle and another relative as his representatives with respect to the child. In February 2003, great-uncle filed a petition in Denver District Court requesting appointment as the child's guardian. In the petition, he stated that both of the child's parents were unwilling or unable to exercise their parental rights.
Mother testified that she did not discover where the child was until March 2003, when great-uncle left a telephone message telling her to come to Denver to get her son. She stated that when she came to Denver, she was allowed to see the child for thirty minutes, but great-uncle then "ran off" with him so that she could not take him back to Texas. Great-uncle denied that he had told mother to come and get the child. He admitted removing the child from the home during mother's visit, but denied any intent to keep the child from mother. He testified that mother did not have the means to take the child back to Texas with her, having come to Denver with only $30.
On March 18, a hearing was held on great-uncle's petition for guardianship. Mother returned to Denver for the hearing and submitted a letter to the court, asking that the guardianship be denied and stating that she was willing to care for the child and wanted to return with him to Texas. The petition for guardianship was denied because of mother's refusal to consent to it.
Mother then called the police and went to great-uncle's home to retrieve the child. However, great-uncle showed the police "some paper," and mother was told that great-uncle could not be compelled to turn the child over to her. Great-uncle testified that he had shown the police a copy of the petition for guardianship. He stated that he refused to turn the child over to mother because he believed that he had been granted legal guardianship of the child and he believed that he had the right to keep him.
Mother returned to Texas and continued her efforts to retrieve the child. She contacted Texas police, and they in turn contacted Denver police, who made a second visit to great-uncle's home and again were persuaded that great-uncle had a right to keep the child.
Mother was told that she should find a Colorado attorney to help her. She attempted to obtain legal help both in Texas and in Colorado, but for nearly two years, she was unsuccessful because she had no money to pay an attorney. Finally, in late 2004 or early 2005, grandmother located a Denver attorney who was willing to represent mother on a pro bono basis.
In April 2005, great-uncle filed a petition requesting that mother's parental rights be terminated. He testified that this was done because he wanted to do the right thing, that his purpose was not to keep the child away from mother, and that he did not know that it would mean that she would not be the child's mother anymore. However, he also stated that he had filed a petition for adoption of the child.
Mother, now represented by an attorney, moved to strike the petition to terminate her parental rights. The Denver Juvenile Court found that the adoption was contested and ordered the parties to set the matter for a hearing. Mother then petitioned the Denver District Court for an order granting her sole decision-making responsibility for the child and designating her as the child's primary residential parent. Neither father nor great-uncle filed a response to mother's petition.
In July 2005, a special advocate was appointed for the child. In his initial report, filed in September, the special advocate reported that, based upon correspondence that *461 he had reviewed, it was apparent that father and great-uncle had "conspired together in 2002 to remove the minor child and alienate him from his mother." He noted that in one letter, father offered great-uncle $6100 to pick up the child in Texas and keep him from mother. The special advocate also noted that although no formal charges of child abuse had been filed against great-uncle, some of his relatives did not believe that the child was safe with him. He recommended that mother have sole allocation of parental responsibilities for the child; that great-uncle should have parenting time once a month, in Texas, at his expense; and that the child should receive therapy, at great-uncle's expense, to help him deal with any issues that might arise because of his alienation from mother.
Shortly after submitting his first report, the special advocate submitted a supplemental report describing problems that he had encountered in conducting his investigation, including great-uncle's use of several aliases, which made investigation difficult, and the reluctance of some of great-uncle's family members to cooperate in the investigation because of fear of great-uncle's reaction. In a second supplemental report, submitted approximately ten days later, the special advocate called the court's attention to a number of errors and irregularities in documents submitted to courts and other entities by father and by great-uncle. Among other things, the special advocate noted that great-uncle had represented himself as the child's legal guardian to school officials and others despite the fact that the Denver Probate Court had denied his petition for guardianship of the child.
A hearing on mother's petition was held on September 21-22, 2005. The court heard testimony from both mother and great-uncle regarding the circumstances in which great-uncle removed the child from Texas, mother's subsequent efforts to retrieve him, and great-uncle's reasons for retaining him. The court also heard the testimony of the special advocate regarding his investigation and his recommendations. Among other things, the special advocate noted that he had found no verification for great-uncle's claim that mother had agreed to his having possession of the child. He noted that father, in letters to great-uncle, had expressed a "tremendous amount of anger" toward mother and had indicated that he was "messing with [mother's] head" in an attempt to get her to leave the child with great-uncle.
The trial court awarded parenting time to both mother and great-uncle. Mother contends that the trial court erred in determining that great-uncle had standing to seek an allocation of parental responsibilities under § 14-10-123(1)(c), C.R.S.2006. We agree.

I.
We first reject mother's suggestion that the trial court should not have determined that great-uncle had standing to seek an allocation of parental responsibilities because he never filed a pleading requesting such an allocation.
Under C.R.C.P. 15(b), when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.
Here, the special advocate investigated great-uncle as a candidate for an allocation of parental responsibilities without objection by mother, and both parties testified and presented arguments regarding the circumstances in which great-uncle removed the child from Texas, the parties' subsequent disputes regarding great-uncle's continued care of the child, and their positions regarding the allocation of parental responsibilities to great-uncle.
We conclude that the trial court did not err in treating great-uncle as a petitioner for parental responsibilities, or in determining that his standing to seek an allocation of parental responsibilities was an issue properly presented to the court with the implied consent of both parties.

II.
However, we agree that because great-uncle did not have physical care of the child for six months or more with mother's consent, *462 he did not have standing under § 14-10-123(1)(c).
Section 14-10-123(1), C.R.S.2006, provides that a proceeding concerning the allocation of parental responsibilities may be commenced:
(a) By a parent . . .; or
(b) By a person other than a parent . . . but only if the child is not in the physical care of one of the child's parents;
(c) By a person other than a parent who has had the physical care of a child for a period of six months or more, if such action is commenced within six months of the termination of such physical care; or
(d) By a parent or person other than a parent who has been granted custody of a child or who has been allocated parental responsibilities through a juvenile court order entered pursuant to section 19-1-104(6), C.R.S. . . .
Subsections (a) and (b) of § 14-10-123(1) incorporate into Colorado law the provisions of § 401(d)(1) and (2) of the Uniform Marriage and Divorce Act (UMDA), known in Colorado as the Uniform Dissolution of Marriage Act. As originally enacted, subsection (b) of § 14-10-123(1) provided that a child custody proceeding could be commenced by a person other than a parent only if the child was not in the physical custody of one of his parents. Colo. Sess. Laws 1971, ch. 130, § 46-1-23 at 529. In 1998, "physical custody" was changed to "physical care." Colo. Sess. Laws 1998, ch. 310 at 1377. Subsection (c) was added in 1973.
Colorado courts have not yet directly addressed the question whether a nonparent must show that the child's parent voluntarily relinquished physical care of the child in order to establish standing to commence a proceeding for the allocation of parental responsibilities under § 14-10-123(1)(c). We note, however, that in In re Custody of C.C.R.S., 892 P.2d 246 (Colo.1995), the supreme court was presented with the argument that "physical custody" means more than the actual, physical possession of a child and that a court should look to other factors, including the manner in which the child came into the nonparent's physical possession, in determining whether a nonparent has physical custody of the child for the purpose of establishing standing under § 14-10-123. The court noted that this interpretation of the term "physical custody" was supported by decisions in other jurisdictions that had adopted provisions identical to § 401(d) of the UMDA, but found that in the case before the court, the parent had voluntarily relinquished physical custody of the child to prospective adoptive parents on the day after he was born, with the intention of terminating her parental rights upon the child's adoption. The child was in the prospective adoptive family's home for approximately six months, and under these facts, the court concluded that the prospective adoptive parents had standing to petition for custody of the child.
It appears that the natural parent's voluntary relinquishment of the child was one of the factors that the supreme court considered in determining that the prospective adoptive parents had standing to seek custody of the child. We conclude that courts should consider the manner in which a child came into the possession of a nonparent in determining the threshold issue whether the nonparent has standing under § 14-10-123.
As the supreme court observed, this interpretation of § 14-10-123 is consistent with decisions of courts in other jurisdictions that have enacted statutes based on § 401(d) of the UMDA. See, e.g., In re A.W.J., 316 Ill. App.3d 91, 249 Ill.Dec. 522, 736 N.E.2d 716 (2000) (appeal allowed Jan. 29, 2001) (determination that a parent does not have physical custody of a child as required for a nonparent to have standing requires a showing that the parent has somehow voluntarily and indefinitely relinquished custody of the child); Moore v. Asente, 110 S.W.3d 336 (Ky.2003) (in determining whether parents have relinquished physical custody of a child in a manner that confers standing upon a nonparent, courts should consider, among other factors, how possession of the child was acquired by the nonparent, especially the intent of the parents at the time of their relinquishment of the child to the nonparent); Girard v. Williams, 291 Mont. 49, 966 P.2d 1155 (1998) (in determining nonparent standing, the appropriate standard is whether the natural *463 parent has voluntarily relinquished custody of the child).
Courts in these jurisdictions have held that the nonparent bears the burden of showing that the natural parent has relinquished physical custody of the child. See In re A.W.J., supra. If the nonparent fails to show that the natural parent relinquished custody of the child, standing is not established. See, e.g., Webb v. Charles, 125 Ariz. 558, 611 P.2d 562 (Ct.App.1980) (where natural father had not relinquished legal rights to his son, grandmother with whom child resided after mother's death did not have standing); In re Custody of McCuan, 176 Ill. App.3d 421, 125 Ill.Dec. 923, 531 N.E.2d 102 (1988) (where mother permitted children to visit grandparents but had not relinquished custody to grandparents, grandparents lacked standing). The fact that a parent has chosen to leave a child temporarily in the care of a nonparent does not permit another nonparent to take the child and acquire standing on that basis. See, e.g., In re Custody of Barokas, 109 Ill.App.3d 536, 65 Ill. Dec. 181, 440 N.E.2d 1036 (1982) (nonparents could not establish standing by taking child from the home of the child's adult sister where mother had placed her).
Courts in jurisdictions that have enacted legislation similar to § 14-10-123 also have held that one parent's unilateral relinquishment of physical custody of a child to a nonparent may not be imputed to the other parent for the purpose of establishing nonparent standing. See, e.g., In re Marriage of Houghton, 301 Ill.App.3d 775, 235 Ill.Dec. 60, 704 N.E.2d 409 (1998) (even if mother relinquished physical custody of child to grandmother, her unilateral relinquishment could not be imputed to father); Naylor v. Kindred, 250 Ill.App.3d 997, 189 Ill.Dec. 552, 620 N.E.2d 520 (1993) (neither parent's right to the care, custody, and control of the child is superior to that of the other parent, but one parent's equal right to the care, custody, and control of the child does not encompass the right to shift custody of the child to a third party).
The purpose of the standing requirement is to safeguard the superior right of natural parents to the care and custody of their children. In re A.W.J., supra. In 2000, the importance of this fundamental right was recognized in Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), and in 2004, a division of this court concluded that, consistent with Troxel's recognition that parents have a fundamental right to the care, custody, and control of their children, the jurisdictional requirements of § 14-10-123(1)(c), which creates standing in nonparents, must be applied narrowly. In Interest of E.L.M.C., 100 P.3d 546 (Colo.App.2004).
Thus, we are persuaded that, as the courts of other jurisdictions have recognized in numerous decisions interpreting statutes similar to § 14-10-123(1)(b), and as our supreme court implicitly recognized in In re Custody of C.C.R.S., supra, a decision interpreting § 14-10-123(1)(c), a nonparent seeking to prove the existence of a parent-like relationship in order to establish standing under § 14-10-123 has the burden of proving that the natural parent voluntarily permitted the nonparent to share in or assume the parent's responsibility to provide physical care to the child.
Here, mother and great-uncle presented sharply differing testimony regarding the alleged agreement that great-uncle would care for the child while mother completed the Job Corps program. Great-uncle testified that mother had agreed to this, or at least knew that it was planned. Mother testified that father and great-uncle had tried to persuade her to agree, and that she had refused to do so. She stated that any agreement had been between father and great-uncle alone.
The trial court did not find that mother had expressly consented to the removal of the child by great-uncle. However, the court found that in December 2002, "the parents caused or allowed the child to come to Denver and stay with the great uncle," and that mother had failed to take adequate steps to get the child back after allowing the child to be removed "with her tacit consent." The court further found that mother had made only "marginal efforts" to reclaim the child after opposing great-uncle's petition for guardianship of the child in March 2003, thus *464 allowing great-uncle to provide physical care to the child for more than six months. Accordingly, the court determined that great-uncle had standing under § 14-10-123.
However, it is undisputed that when mother entered the Job Corps program, the child was not left in the care of great-uncle. It is undisputed that when great-uncle took the child, he did so without informing mother. It is also undisputed that when mother discovered that great-uncle had taken him, she immediately began asking for his return.
These facts do not support the trial court's finding that mother had tacitly consented to allow great-uncle to remove the child to Denver and assume responsibility for his care, and our review of the record has not revealed any other evidence that would support such a finding. It does not appear that mother ever agreed to allow great-uncle to care for the child permanently or for an indefinite period. Moreover, if she ever agreed to allow great-uncle to provide temporary care for him while she completed the Job Corps program  which she denies  the evidence indicates that she changed her mind before she entered the program and made other arrangements for the child's care. We thus conclude that the court's finding that mother tacitly consented to the child's removal by great-uncle is clearly erroneous and not supported by the record. Accordingly, we are free to reject it. See Gebhardt v. Gebhardt, 198 Colo. 28, 595 P.2d 1048 (1979) (factual findings of the trial court are not to be disturbed on appeal unless clearly erroneous and not supported by the record).
We further conclude that even if great-uncle believed when he removed the child from Texas that he had both parents' permission to care for him while mother completed the Job Corps program, he could not have maintained that belief after mother left the Job Corps program and requested the return of the child. Nor could great-uncle rely on father's consent alone to justify a belief that he had the child with the consent of both parents, as father's consent could not be imputed to mother. When great-uncle was made aware that mother did not consent to his continuing care of the child, he could no longer claim that he was providing "physical care" for the child for the purpose of establishing standing under § 14-10-123(1)(c). Because it is not disputed that great-uncle was made aware that mother sought the return of the child well before the end of the six-month period required to establish standing under § 14-10-123(1)(c), we conclude that as a matter of law he does not have standing to seek an allocation of parental responsibilities.
Great-uncle is not helped by the provisions of § 14-10-123(1)(b) either. That section grants standing to "a person other than a parent" to commence proceedings where "the child is not in the physical care of one of the child's parents." Section 14-10-123(1)(b); see also In the Interest of K.M.B., 80 P.3d 914 (Colo.App.2003). However, like § 14-10-123(1)(c), § 14-10-123(1)(b) is limited by the requirement that the biological parents consent or acquiesce in the transfer of physical care to the party seeking to have standing. For example, In re Marriage of Houghton, supra, stands for the proposition that if the child is removed from the physical care of the parents without their consent, the lack of consent is enough to bar the non-parent's claim of standing. In Houghton, the mother's unilateral relinquishment of physical custody of the child to a grandmother could not be imputed to the father. Illinois has, like Colorado, adopted the Uniform Dissolution of Marriage Act, and its standing statute is very similar to § 14-10-123(1)(b) (a section derived from the Uniform Act). We read §§ 14-10-123(1)(b) and (1)(c) as complementary in that both require volition on the part of the biological parents. Were we to read them otherwise, the great-uncle could remove the child against the protest of the biological mother and have standing to seek parental rights.
Having determined that great-uncle does not have standing to seek an allocation of parental responsibilities, we need not address mother's remaining contentions.
The judgment is reversed, and the case is remanded to the trial court for entry of an order allocating all parental responsibilities to mother and directing that, if the child is *465 not in mother's physical possession, he shall be returned to her without delay.
Judge CASEBOLT and Judge RUSSEL concur.