277 P.3d 818 (2012)
In the Interest of Child B.B.O.
Virginia Olds, Petitioner.
v.
Gay Lakay Berry, Respondent.
No. 10SC623.
Supreme Court of Colorado, En Banc.
May 29, 2012.
Mile High Law Office, Katherine O. Ellis, Denver, Colorado, Attorneys for Petitioner.
James Wade Noland, Golden, Colorado, Attorneys for Respondent.
Hogan Lovells US, LLP, Michael C. Theis, Christopher O. Murray, Stephanie Villafuerte, Jeffrey C. Koy, Denver, Colorado, Attorneys for Amicus Curiae the Rocky Mountain Children's Law Center.
McGuane and Hogan, LLP, Brenda L. Storey, Denver, Colorado, Attorneys for Amicus Curiae the Family Law Section of the Colorado Bar Association.
*819 Justice BOATRIGHT delivered the Opinion of the Court.
¶ 1 In this appeal, we review an unpublished opinion by the court of appeals reversing the trial court's allocation of primary parental responsibilities to the half-sister of a minor child on grounds that the sister lacked standing to petition for an allocation of parental responsibilities. The court of appeals construed sections 14-10-123(1)(b) and (1)(c), C.R.S. (2011), as requiring that, in order to establish standing to petition for an allocation of parental responsibilities, a nonparent must show that the child's parents voluntarily permitted the nonparent to assume responsibility for or share in the child's care. We construe the statute and hold that parental consent is not required for nonparent standing. We therefore reverse the judgment of the court of appeals and remand to the court of appeals for consideration of the remaining issues raised on appeal.

I. Factual and Procedural Background
¶ 2 This case involves the allocation of parental responsibilities (APR) of a minor child, B.B.O. B.B.O. is the biological child of Gay Lakay Berry (Berry) and Harry Lee Olds (Olds), and the half-sister of Virginia Olds (V.O.), Olds's adult child from a previous relationship. Berry and Olds divorced approximately five months before B.B.O. was born. B.B.O. resided out-of-state with her mother until she was approximately three years old, when, at Berry's request, Olds brought B.B.O. to live with him in Colorado. V.O. also was living with her father in Colorado.
¶ 3 B.B.O. resided with her father and her half-sister in Colorado for approximately six years until her father's death in 2008, at which time B.B.O. continued to reside with her half-sister. For the first one-and-one-half to two years that B.B.O. lived with her father in Colorado, her mother visited B.B.O. on a regular basis. During the last four or five years that B.B.O. lived with her father, her mother did not have any direct physical contact with B.B.O. but continued to interact by telephone, letters, and cards.
¶ 4 Two months after Olds's death, V.O. petitioned for an allocation of parental responsibilities. At that point, B.B.O. had lived with her half-sister for more than six years. The court appointed a child and family investigator (CFI) who recommended that V.O. have primary parental responsibility for B.B.O. with liberal parenting time for Berry. Berry moved to dismiss, and later moved for summary judgment, on the ground that V.O. lacked standing to seek an allocation of parental responsibilities under section 14-10-123(1)(b) or (1)(c), C.R.S. (2011). The trial court found that V.O. had standing under both sections 14-10-123(1)(b) and (1)(c) because B.B.O. was in the care of her half-sister and was not in the care of either parent, and Berry had implicitly consented and acquiesced to V.O. caring for B.B.O. Following a permanent orders hearing on the merits, the trial court determined that it was in B.B.O.'s best interest to reside primarily with her half-sister with scheduled parenting time for Berry as recommended by the CFI.
¶ 5 Berry appealed both the standing and best interest determinations by the trial court. With regard to V.O.'s standing to petition for an allocation of parental responsibilities, Berry argued that a nonparent does not have standing under section 14-10-123(1)(b) or (1)(c) unless a child's parents have consented to the nonparent providing care for the child. Berry asserted that she never consented to V.O. caring for B.B.O. in the absence of Olds. The court of appeals agreed. The court of appeals concluded that the manner by which a child comes to be in the possession of a nonparent is relevant to the standing determination. Relying on In re C.R.C., 148 P.3d 458, 463 (Colo.App.2006), an opinion by another division of the court of appeals, the court of appeals in this case held that, in order to establish standing under either XX-XX-XXX(1)(b) or (1)(c), a "nonparent must show that the child's parents voluntarily permitted the nonparent to share in or assume the parents' responsibility for the child's care." The court of appeals found no evidence in the record that Berry had consented to V.O. caring for B.B.O. in Olds's absence, and, applying C.R.C., concluded that V.O. lacked standing to seek an APR. Because the court of appeals decided the appeal on standing grounds, the court did not consider *820 Berry's challenge to the trial court's substantive determination that allocating primary parental responsibility to V.O. was in the best interest of B.B.O. We granted certiorari and now reverse.[1]

II. Standard of Review
¶ 6 We review de novo a trial court's conclusions of law concerning the application and construction of statutes, Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dep't, 196 P.3d 892, 897 (Colo.2008), while we review a trial court's findings of jurisdictional fact for clear error, Springer v. City and Cnty. of Denver, 13 P.3d 794, 798 (Colo.2000). Our main task in construing a statute is to ascertain and give effect to the intent of the General Assembly in enacting it. In re Marriage of Ikeler, 161 P.3d 663, 666 (Colo.2007). We begin with the language of the statute. Id. If the statutory language is clear, we interpret the statute according to its plain and ordinary meaning, without resort to other rules of statutory construction. People v. Rickman, 178 P.3d 1202, 1206 (Colo.2008).

III. Analysis
¶ 7 We begin by reviewing the language of the statute. Then, because the court of appeals relied on C.R.C. to inform its construction of the statute, we examine C.R.C., and two additional cases upon which it relied, to understand the source of the court of appeals' rationale.

A. The Language of Section 14-10-123(1)
¶ 8 Nonparent standing to seek an allocation of parental responsibilities is governed by section 14-10-123, C.R.S. (2011). Section 14-10-123(1) provides for a nonparent to seek an allocation of parental responsibilities in two circumstances that are relevant here: (1) if the child is not in the physical care of one of the child's parents, pursuant to subsection (1)(b); or (2) if the nonparent has had physical care of the child for at least six months and commences the action within six months of the termination of that care, pursuant to subsection (1)(c). To this end, the statute provides that an APR proceeding may be commenced:
(b) By a person other than a parent, by filing a petition seeking the allocation of parental responsibilities for the child . . ., but only if the child is not in the physical care of one of the child's parents;
(c) By a person other than a parent who has had the physical care of a child for a period of six months or more, if such action is commenced within six months of the termination of such physical care;
. . . .
§ 14-10-123(1).
¶ 9 According to the plain language of the statute, whether a nonparent has standing to petition for an allocation of parental responsibilities turns on who has or recently had physical care of the child. Nothing in the statutory language suggests that parental consent to a nonparent providing care for a child is necessary for the nonparent to establish standing. The word consent does not appear in the statutory text, nor is there any reference in the statute to the means by which the child comes to be in the nonparent's care. The term "care" is not defined in the statute but has a plain and ordinary meaning that contemplates "responsibility for or attention to safety and well-being." Webster's Third New International Dictionary 338 (2002). Thus, there is no statutory basis for reading a consent requirement into the concept of care for standing purposes in section 14-10-123(1)(b) or (1)(c). Despite the plain language of the statute, the court of appeals looked beyond the statutory language to resolve this case. We examine the authority upon which the court of appeals relied to understand the source of the consent requirement that the court of appeals read into the statute.

*821 B. The Court of Appeals' Rationale
¶ 10 As grounds for reversing the trial court's standing determination, the court of appeals relied on C.R.C., a prior decision by a division of the court of appeals, which held that parental consent was necessary for a nonparent to establish standing under sections 14-10-123(1)(b) and (1)(c). C.R.C. also went beyond the statutory language, relying instead on language from our decision in In re Custody of C.C.R.S., 892 P.2d 246 (Colo. 1995) to reach its holding, and found confirmation in the United States Supreme Court's recognition of the fundamental rights of parents in Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). To understand the court of appeals' rationale in this case, we review C.C.R.S. and Troxel and their application in C.R.C.
¶ 11 In C.C.R.S., we considered whether, for standing purposes, the term "physical custody" meant, literally, that a nonparent had actual physical possession of the child, or whether the term had legal connotations such that a nonparent must have a legal basis for physical custody before the nonparent could establish standing.[2]C.C.R.S., 892 P.2d at 251-52. In that case, the biological mother had released custody of her newborn son in contemplation of adoption, but later revoked the release of custody and indicated she no longer wished to relinquish her parental rights. Id. at 248, 253. The prospective adoptive parents, who had actual physical possession of the child for more than six months, sought custody. Although we noted that the child came into the prospective adoptive parents' care with the mother's consent, ultimately we adopted a "literal definition of `physical custody' that factor[ed] in the amount of time a child has spent in the actual, physical possession of a non-parent and the psychological bonds non-parents develop with children who have been in their physical possession and control for a significant period of time." Id. Accordingly, we held that the prospective adoptive parents had standing to petition for an APR.
¶ 12 After our decision in C.C.R.S., the United States Supreme Court considered a constitutional challenge with standing implications to Washington's nonparental visitation statute. Troxel, 530 U.S. 57, 120 S.Ct. 2054. In Troxel, Washington's statute permitted "any person" to petition for visitation rights "at any time" and allowed a court to grant visitation whenever the court determined that such visitation "may serve the best interest of the child" without according any deference to the parent's visitation decision.[3]Id. at 61, 120 S.Ct. 2054. The plurality opinion recognized the interests of parents in the care, custody, and control of their children as perhaps the oldest fundamental liberty interest recognized by the Court and protected by the Due Process Clause of the Fourteenth Amendment. Id. at 65-66, 120 S.Ct. 2054. Because fit parents are presumed to act in the best interests of their children, the plurality held that due process requires a court to afford at least some special weight to the decisions of a fit parent. Id. at 68-69, 120 S.Ct. 2054. Thus, the court considered whether Washington's nonparental visitation statute infringed on the due process rights of parents.
¶ 13 The plurality called Washington's statute "breathtakingly broad" because it permitted "any third party seeking visitation to subject any decision by a parent concerning visitation . . . to state-court review," without requiring the court to accord any weight to a parent's decision, in effect allowing a state court to overturn any decision by a fit parent on petition by any third party affected by the *822 decision. Id. at 67, 120 S.Ct. 2054. The plurality concluded that the Washington statute, as applied, unconstitutionally infringed on the fundamental rights of parents. Id. Because Troxel was decided after our decision in C.C.R.S., the court of appeals attempted to apply the holding in Troxel to section 14-10-123(1) in C.R.C.
¶ 14 The court of appeals relied on Troxel and C.C.R.S. to conclude in C.R.C. that parental consent is required for a nonparent to establish standing to petition for an APR.[4] 148 P.3d at 463. There, a great-uncle took the child to live with him at the father's request, but without the consent or even the knowledge of the mother who was in the Job Corps at the time. Id. at 459-60. When the mother subsequently attempted to recover her child, the great-uncle resisted her efforts. Id. at 460. Based on our observation that C.C.R.S.'s mother had voluntarily relinquished custody to the prospective adoptive parents, the division in C.R.C. concluded that voluntary relinquishment was a dispositive factor in determining whether a nonparent has standing to seek an APR. Id. The division also suggested that standing requirements must be read narrowly in order to safeguard the fundamental rights of parents recognized by Troxel. Id. at 463. In other words, the division held that a nonparent must show that the natural parents voluntarily permitted the nonparent to assume responsibility for, or share in, the care of the child in order to petition for an allocation of parental responsibilities. Id. In so holding, the court of appeals conflated standing requirements with best interest considerations.
¶ 15 The court of appeals misapplied C.C.R.S. and Troxel in C.R.C. In relying on C.C.R.S., the division gave undue weight to the mother's voluntary relinquishment of custody but overlooked the holding of that case, by which we rejected a legal definition of "physical custody" and adopted a literal construction of that phrase to mean "actual physical possession." In so doing, we recognized that, over time, children form psychological bonds with their caregivers, and those important relationships should not be precluded, by virtue of our construction of a standing provision, from a trial court's consideration when it allocates parental responsibilities based on the best interests of the child. See C.C.R.S., 892 P.2d at 253 (adopting a definition of "physical custody" that "factor[ed] in the amount of time a child has spent in the actual, physical possession of a non-parent and the psychological bonds non-parents develop with children who have been in their physical possession and control for a significant period of time" (emphasis added)). Our holding in C.C.R.S. does not, therefore, stand for the proposition that parental consent to a nonparent caring for a child is necessary for a nonparent to establish standing to seek an allocation of parental responsibilities.[5]
¶ 16 Similarly, the division in C.R.C. read Troxel as requiring that standing requirements be interpreted narrowly in order to protect the fundamental rights of parents. The Supreme Court plurality found Washington's statute unconstitutional as applied because it allowed any third party to petition for visitation and a Washington state court was not required to accord any deference to a fit parent's decisions in making its own best interest determination. In fact, the plurality indicated that the problem "[was] not that the Washington [state court] had intervened, but that when it did so, it gave no special weight at all to [the mother's] determination of her daughter's best interests." Troxel, 530 U.S. at 69, 120 S.Ct. 2054. Thus, although standing and merits provisions were contained in the same section of Washington's nonparental visitation statute, the plurality appears to have separated standing from best interest considerations.
¶ 17 Section 14-10-123(1) is substantially more narrow than the Washington statute *823 that was overturned in Troxel. Subsection (1)(b) provides for nonparent standing only when neither parent is caring for the child. § 14-10-123(1)(b). Where a parent is caring for the child, subsection (1)(c) limits the class of nonparents who may petition for an allocation of parental responsibilities to those nonparents who have had a recent and significant role as caregivers, caring for the child for a period of at least six months prior to filing the APR petition and filing the petition within six months of the termination of such care. § 14-10-123(1)(c). Moreover, unlike the Washington statute, the best interest of the child standard is not codified with the standing provisions of section 14-10-123(1). Rather, section 14-10-123.4, C.R.S. (2011), provides that children have the right to have determinations relating to parental responsibilities based upon the best interests of the child, and our case law establishes that fit parents' decisions concerning the care, custody, and control of their children are presumed to be in the best interest of the child, see In re B.J., 242 P.3d 1128, 1132 (Colo. 2010).[6] Accordingly, it is not necessary to read a parental consent requirement into either section 14-10-123(1)(b) or (1)(c) in order to protect the fundamental liberty interests of parents in the care, custody, and control of their children.
¶ 18 After considering the court of appeals' rationale and the requirements of Troxel, we disagree with the court of appeals' reading of a consent requirement into the statute. The statutory language is clear and dispositive and parental consent to a nonparent caring for a child is not necessary to satisfy the constitutional mandates of Troxel:[7] if the child is not in the physical care of either parent, a nonparent has standing under section 14-10-123(1)(b), and if a nonparent had physical care of the child for at least six months and petitions for an APR within six months of the termination of such care, the nonparent has standing under section 14-10-123(1)(c). Consistent with the rationale in C.C.R.S., we recognize that the term "physical care" factors in the amount of time a child has spent actually in the care of a nonparent and the psychological bonds that may form as a result. Hence, we hold that parental consent is not required for a nonparent to establish standing to petition for an APR under section 14-10-123(1)(b) or (1)(c). We therefore consider the applicability of the statute to the case before us.

IV. Application
¶ 19 In this case, it is undisputed that B.B.O. was in the physical care of her father and her half-sister for six years prior to Olds's death and that V.O. continued to care for B.B.O. following Olds's death until she filed the petition for an allocation of parental responsibilities at issue here. Although the parties disagree as to whether Berry voluntarily agreed to allow V.O. to care for B.B.O. after Olds's death, Berry's consent was not required in order for V.O. to establish standing to petition for an APR. Because B.B.O. was in the physical care of her half-sister and was not in the physical care of either parent at the time V.O. filed the petition for an APR, V.O. had standing under section 14-10-123(1)(b).[8] Accordingly, we reverse the judgment of the court of appeals and remand to *824 the court of appeals for consideration of the remaining issues raised on appeal.

V. Conclusion
¶ 20 For the foregoing reasons, we hold that parental consent is not required for nonparent standing. We reverse the judgment of the court of appeals and remand to the court of appeals for consideration of the remaining issues raised on appeal.
Justice EID concurs in the judgment.
Justice EID, concurring in the judgment.
¶ 21 I agree with the majority that the plain language of sections 14-10-123(1)(b) and (c), in and of itself, does not impose a requirement that a parent consent to a nonparent's "physical care" of a child in order for the nonparent to have standing to petition for allocation of parental responsibilities. Maj. op. at ¶ 9. But I would not find that "the means by which the child comes to be in the nonparent's care" is never relevant to the standing inquiry, as the majority seems to do. Id. To give an example, in my view, a kidnapper would not have standing to petition for allocation of parental responsibilities because, although the child may have been in the "physical care" of the kidnapper for six months or more, the child was placed in that care through criminal means. Under such circumstances, any such "care" of the child was void and illegitimate from the start. Indeed, if sections 14-10-123(1)(b) and (c) were read so broadly as to always exclude the circumstances under which a child came to be in the care of the nonparentthat is, if the statutes were read so broadly so as to bestow standing upon a kidnapperthey would be as problematic as the Washington statute at issue in Troxel v. Granville, 530 U.S. 57, 61, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), which permitted any third party to petition for visitation.
¶ 22 The majority's response may be that, although the kidnapper would have standing to seek allocation of parental responsibilities, he would lose on the merits that is, he would not be allocated parental responsibilities because it would not be in the best interests of the child to do so, especially in light of the fact that "a fit parent's decisions are presumed to be in the best interest of the child." Maj. op. at ¶ 18 n. 7; see also id. at ¶ 14 (criticizing the court of appeals for "conflat[ing] standing requirements with best interest considerations"); id. at ¶ 16 (suggesting that "although standing and merits provisions were contained in the same section of Washington's nonparental visitation statute, the plurality appears to have separated standing from best interest considerations"); id. at ¶ 17 (placing significance on the fact that, unlike the Washington statute, "the best interest of the child standard is not codified with the standing provisions" under our statutes); id. at ¶ 17 n. 6 (finding that our holding in In re B.J., 242 P.3d 1128 (Colo.2010)that the presumption that a fit parent acts in the best interest of the child applies to all phases of an allocation of parental rights proceeding does not apply to standing). But I would find that simply granting the kidnapper standing, thus allowing him to litigate the merits, would raise concerns under Troxel. See, e.g., 530 U.S. at 67, 120 S.Ct. 2054 (plurality opinion) (noting that, "in practical effect, in the State of Washington a court can disregard and overturn any decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition" (first emphasis in original; second emphasis added)). I therefore cannot agree with the majority's broad pronouncement that Troxel would never be implicated in an analysis of nonparental standing under sections 14-10-123(1)(b) and (c). Maj. op. at ¶ 18. But cf. Troxel, 530 U.S. at 67, 120 S.Ct. 2054 ("The Washington Supreme Court had the opportunity to give [the statute] a narrower reading, but it declined to do so.").
¶ 23 The facts of this case, however, do not raise these sorts of concerns. Here, the trial court found that "there was implied consent and acquiescence by [the respondent] to [the child] being in the care of both [the father] and [petitioner]," and that "from a legal perspective [the respondent] abandoned [the child] to the care of [the father] and [petitioner]." Thus, in order to resolve this case we need only hold that the plain language controls because, on this record, Troxel is not *825 implicated. Accordingly, I would reverse the court of appeals on this ground, and I concur in the judgment reached by the majority.
NOTES
[1] We granted certiorari to consider:

Whether the court of appeals erred in concluding that subsections 14-10-123(1)(b) & (1)(c), C.R.S. (2011), require, as a prerequisite to a nonparent's standing to commence a proceeding for an allocation of parental responsibilities, the consent of both natural parents to the nonparent's sole physical care of the child.
[2] When we decided C.C.R.S., section 14-10-123(1) used the term "custody" rather than the term "care." See ch. 310, sec. 3, § 14-10-123, 1998 Colo. Sess. Laws 1376, 1377. The mother in C.C.R.S. argued that "`physical custody' mean[t] more than actual physical possession of a child and that a court should look to a number of factors, including the manner in which the child came into the non-parent's physical possession, the intentions and expectations of the natural parents when relinquishing the child, and the duration of the non-parent's possession." C.C.R.S., 892 P.2d at 252.
[3] The statute provided: "Any person may petition the court for visitation rights at any time including, but not limited to, custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been a change of circumstances." Id. at 61, 120 S.Ct. 2054.
[4] In C.R.C. the court of appeals considered nonparent standing to seek an APR under the current version of section 14-10-123(1), which uses the term "care," rather than "custody." 148 P.3d at 462.
[5] Moreover, the language of section 14-10-123(1) had changed by the time the court of appeals decided C.R.C. While the term "custody" may have had legal connotations, the term "care" is not a legal term of art and has a plain and ordinary meaning related to the provision for a child's safety and well-being.
[6] In re B.J. came to us at the investigatory stage of an APR proceeding after nonparent standing to petition had already been determined. The district court had ordered overnight visitation with the petitioning nonparents over the objection of the natural father in order to aid the CFI's report after determining that Troxel's standards were inapplicable to the investigatory stage of an APR proceeding. Id. at 1131. We held that the constitutional presumption that a fit parent acts in the best interest of the child applies to all stages of an APR proceeding and can only be overcome by clear and convincing evidence that the parental determination is not in a child's best interest. Id. at 1132. We do not read this decision as injecting best interest considerations into the standing determination, which only resolves the question of who may file suit, and does not encompass the merits of the proceedings.
[7] When allocating parental responsibilities based on the best interests of the child, a court must accord fit parent's decisions special weight as directed by Troxel. In Colorado, a fit parent's decisions are presumed to be in the best interest of the child. In re B.J., 242 P.3d at 1132.
[8] Because we conclude that V.O. had standing under subsection (1)(b), we do not decide whether V.O. also had standing under subsection (1)(c), which refers to an action being commenced after the termination of physical care.