**In the Interest of L.F., a Child,**

**Upon the Petition of Dorene Sharp, Petitioner–Appellant,**

**and**

**Concerning William Dean Fritzler and Rashell Lanay Fritzler, Respondents–Appellees.**

No. 04CA0071.

Colorado Court of Appeals, Div. V.

March 10, 2005.

As Modified on Denial of Rehearing May 26, 2005.

Certiorari Denied Oct. 3, 2005.

Helena Schultz, Brush, Colorado, for Petitioner–Appellant.

Law Offices of Crespin and Wilson, LLC, Stuart D. Crespin, Marion Wilson, Fort Morgan, Colorado, for Respondents–Appellees.

CARPARELLI, J.

Dorene Sharp (grandmother) appeals from the trial court's orders denying her request for an investigation into alleged sexual abuse of L.F., and denying her standing to pursue an allocation of parental responsibilities with respect to her grandchild, L.F. We affirm.

I. Request for Investigation
Into Child Abuse

■ Grandmother asserts that the trial court erred in denying her motion requesting an investigation into child abuse pursuant to § 19–3–501, C.R.S.2004. We disagree.

Section 19–3–501(1), C.R.S.2004, permits a law enforcement officer or "other person" to initiate an investigation into possible child abuse or neglect by referring the matter to the court. The statute provides that upon receiving such a referral, the court "shall have a preliminary investigation made to determine whether the interests of the child or of the community require that further action be taken, which investigation shall be made by the probation department, county department of social services, or any other agency designated by the court." The court may then authorize a petition in dependency and neglect to be filed, resolve the matter informally, or decide that no further action is required.

■ Although the statutory scheme provides for private persons to file reports of child neglect, it is the state that investigates the charges and brings the case if intervention is warranted. *McCall v. Dist. Court,* 651 P.2d 392 (Colo.1982).

Here, grandmother became concerned that the child was being abused by her father. She reported the matter to social services, and an investigation was conducted. She also persuaded mother to take the child to her pediatrician for an examination. No action was taken after either the investigation or the examination.

In August 2003, grandmother and her husband filed a motion seeking "a preliminary investigation" into the allegations of child abuse. They requested that the court grant them a full hearing with respect to their allegations, allow them to present expert testimony regarding child sexual abuse and normal examinations, and then order the department of social services to investigate further. The court denied this motion without comment.

We perceive no error. The record shows that an investigation had already been done by the department of social services, and the child had been examined by her doctor. Neither the department nor the doctor had proceeded with the matter. Section 19–3–501 does not require that the court undertake its own investigation by holding a hearing. Nor does it require that the court order the department of social services to conduct an additional investigation if it appears that a preliminary investigation has already been completed and the department saw no need to pursue the matter.

## II. Standing to Seek Allocation of Parental Responsibilities

Grandmother also contends that the trial court erred when it ruled that she lacked standing to pursue her petition for allocation of parental responsibilities pursuant to § 14–10–123(1)(c), C.R.S.2004. We disagree.

Grandmother petitioned for allocation of parental responsibilities under § 14–10–123(1)(c), asserting that the child has been subjected to physical and emotional abuse and neglect and that the child has a greater bond with her than with her parents. Grandmother did not petition for visitation rights under § 19–1–117, C.R.S.2004. Instead, she sought allocation of the full spectrum of parental responsibilities including decision-making. The parents moved for dismissal, arguing that grandmother lacked standing, and the court granted their motion.

### A. Applicable Law

We first consider the legal framework for determining the allocation of parental rights.

### 1. Constitutional and Statutory Rights

Parents have a fundamental right to make decisions concerning the care, custody, and control of their children. So long as a parent adequately cares for his or her children, the state does not normally have a reason to question the ability of the parent to make the best decisions concerning the rearing of that parent's children. *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

Consistent with the fundamental right of parents to make decisions regarding their children, Colorado courts have historically recognized a presumption that the biological parent has a first and prior right to custody in a dispute between a parent and a nonparent. *In re Custody of C.C.R.S.*, 892 P.2d 246 (Colo.1995)(*C.C.R.S.II* ).

Nonetheless, a proceeding concerning the allocation of parental responsibilities may be commenced by "a person other than a parent who has had the *physical care* of a child for a period of six months or more, if such action is commenced within six months of the termination of such physical care." Section 14–10–123(1)(c) (emphasis added).

"Physical care" is not defined in either Colorado's Uniform Dissolution of Marriage Act (UDMA), § 14–10–101, et seq., C.R.S. 2004, or in the Uniform Marriage and Divorce Act from which the UDMA is derived.

### 2. Statutory Construction

When construing a statute, our task is to determine and give effect to the intent of the General Assembly. *In Interest of K.M.B.*, 80 P.3d 914 (Colo.App.2003).

Because parental responsibility proceedings under § 14–10–123(1)(c) encroach on a parent's fundamental rights, statutory interference with the constitutional rights of a fit, legal parent is subject to strict scrutiny. Therefore, we interpret the jurisdictional requirements of § 14–10–123(1)(c) narrowly. *In Interest of E.L.M.C.*, 100 P.3d 546 (Colo. App.2004).

### 3. Physical Care

To determine whether a nonparent had "physical care," and, thus, to determine whether the nonparent has standing to seek allocation of parental responsibilities, courts should consider the nature, frequency, and duration of contacts between the child and the parent and between the child and the nonparent. *In re V.R.P.F.*, 939 P.2d 512 (Colo.App.1997). These considerations include "the amount of time [the] child has spent in the actual, physical possession of [the] non-parent" and the parent. *C.C.R.S.*

*II, supra,* 892 P.2d at 253 (citing the definition of "physical custody" as then set forth in the Uniform Child Custody Jurisdiction Act, Colo. Sess. Laws 1973, ch. 163, § 46–6–2(9) at 557, prior to the General Assembly's 1998 amendment changing "physical custody" to "physical care" for the purpose of determining jurisdiction under § 14–10–123(1)(c)). The nonparent's physical care need not be uninterrupted or exclusive of the parent's care. *In Interest of E.L.M.C., supra.*

## B. Facts

Here, many pertinent facts were undisputed. The child's mother had heart surgery in July 2000, just over a month after the child was born, and, during mother's recuperation, grandmother cared for the child. The majority of grandmother's care was provided in the parents' home and under the parents' direction. From about October 2000 until the end of December 2000, grandmother provided care three or four days per week. During that time, others, including the parents, also provided care, and the parents provided nearly exclusive care in the evenings, overnight, and on weekends.

In February 2001, mother was seriously injured in an automobile accident and hospitalized for more than three months. Except for a very limited time after the accident, the parents gave directions to grandmother regarding the general nature of the child's care. After mother returned home in June 2001, grandmother provided much of the child's care and stayed in the parents' home, often overnight, six or seven days per week. During this period, the parents also lived in the home and provided directions to grandmother concerning all major aspects of the child's care. Grandmother's care decreased gradually until it ceased in August 2002.

## C. Trial Court Findings

In its ruling the court stated that it considered the extent to which the parents and grandmother were each responsible for feeding, bathing, grooming, clothing, disciplining, and educating the child. It also considered the extent to which each arranged for medical care, interaction with other children, babysitting, and day care.

The court found that the parents "merely chose [grandmother] to be a day care provider and to furnish babysitting services." It also found that, "except for very short periods of time when the biological mom was in surgery, or at times when she was at a rehabilitative hospital, either she or the biological father gave direction to [grandmother] regarding the provisions of day-to-day care for [the child]." The record supports these findings.

## D. Exclusion of Testimony Regarding Child's Bonds with Grandmother and Parents

■ Grandmother contends that the trial court erred when it denied her the opportunity to testify regarding the child's bonds with her, and with mother and father. She relies on *C.C.R.S. II* and argues that the trial court was required to consider testimony regarding the child's psychological bonds with the parties. We disagree.

### 1. Testimony at the Hearing

During redirect examination, grandmother's attorney asked her to describe the bonds between her and the child and between the parents and the child. The trial court sustained the parents' objection, ruling that the answer would not be relevant to the narrow scope of the proceedings. Grandmother made no offer of proof regarding either the nature or the quality of the bonds she proposed to address. Nor did grandmother explain how her testimony would be probative of the issue of physical care or suggest that she would testify that she was a psychological parent. Instead, grandmother concluded her testimony by explaining that she believed the child was being sexually abused and that she brought the action to get the child out of the parents' home.

### 2. Standard of Review

■ Rulings on the relevancy of evidence are within the sound discretion of the trial court and will not be disturbed on review absent an abuse of discretion. *KN Energy, Inc. v. Great W. Sugar Co.,* 698 P.2d 769 (Colo.1985). Generally, error may not be

predicated on a ruling that excludes evidence unless the proponent makes an offer of proof or the question informs the court of the substance of the evidence. CRE 103(a)(2).

### 3. C.C.R.S.

Grandmother's reliance on *C.C.R.S. II* is misplaced. Here, the trial court found, with record support, that grandmother provided day care to assist the parents and that the terms of that care were always subject to the wishes and direction of the parents.

In contrast, in *C.C.R.S. II*, the petitioners in the trial court were prospective adoptive parents who had exclusive physical care of the child for the first six months of his life and who continued to have exclusive care when they initiated custody proceedings. The respondent, the child's birth mother, had visited the child for only brief periods twice in the first two years of his life. The prospective adoptive parents were not temporary or intermittent care providers, nor did they act subject to the wishes and directions of the birth mother. *In re Custody of C.C.R.S.*, 872 P.2d 1337 (Colo.App.1993), *aff'd, C.C.R.S. II, supra.*

### 4. Discussion

We recognize that children can develop bonds with members of their immediate and extended families, family and nonfamily caregivers, teachers, and others who nurture them. In some instances, the bond between a child and a nonparent may become quite strong. However, for purposes of standing, the essential issue is whether the petitioner had "physical care" of the child as required by the statute, not whether the child formed a bond with the caregiver.

Granting standing under § 14–10–123(1)(c) to those who care for and nurture a child at the request of and under the ongoing direction and control of the parents could be disruptive of the parent-child relationship and implicate the parents' decision-making rights, regardless of whether the caregiver developed a bond with the child. It could also burden parents who continue to exercise their decision-making rights with the threat that those who provide care at their discretion and under their direction would be able

to initiate emotionally and financially costly litigation. *Troxel v. Granville, supra,* 530 U.S. at 75, 120 S.Ct. at 2065 ("the burden of litigating a domestic relations proceeding can itself be 'so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated" ' (majority opinion, quoting Justice Kennedy's dissent)).

Therefore, we conclude that the existence of a bond between a caregiver and a child, or the lack of a bond between the parents and the child, where the parents continue to exercise their parental rights by directing the caregiver, is not relevant to the determination of whether the caregiver had "physical care" of the child as required by § 14–10–123(1)(c). *Cf. In Interest of E.L.M.C., supra* (recognizing the need to protect parents against efforts by babysitters, nannies, and other day care providers to wrest decision-making responsibility from the parents under whose supervision they provided care).

Hence, even assuming that counsel's question regarding the child's bonds made the substance of the answer sufficiently clear to preserve the issue for our review, we discern no abuse of discretion in the court's ruling.

### E. Unilateral Decision–Making

Grandmother further argues that the trial court erred when it held that, for her to have "physical care" under the statute, the parents must have authorized her to make unilateral decisions consistent with being the child's primary caretaker and that here they did not intend to transfer primary caretaking responsibility to her. We perceive no reversible error.

The extent to which the parent and the nonparent have each been responsible for and have each made decisions regarding various aspects of the child's physical care may be probative of the nature of the contacts between a child and parent and between a child and nonparent caregiver. *See In re V.R.P.F., supra.*

Here, however, because the trial court found that grandmother's care was subject to the parents' discretion and direction, we need

not decide whether proof that the parents relinquished such control by transferring primary or unilateral caretaking responsibility to grandmother would have resulted in sufficient "physical care" to confer standing.

Therefore, we conclude that, even assuming the trial court's comment was erroneous, any error was harmless.

### F. Conclusion

Consistent with the concerns expressed in *Troxel* regarding fundamental parental rights, we interpret the jurisdictional requirements of § 14–10–123(1)(c) narrowly. *See Troxel v. Granville, supra; In Interest of E.L.M.C., supra.* And, in doing so, we conclude that the General Assembly did not intend that the term "physical care" grant temporary caregivers standing to seek allocation of parental responsibilities when their care is subject to the continuing direction and discretion of the child's parents. Accordingly, we conclude that such care does not constitute "physical care" within the meaning of § 14–10–123(1)(c).

Based on the trial court's finding that grandmother provided care to assist the parents and that the terms of that care were always subject to the discretion and direction of the parents, we conclude that grandmother does not have standing to seek allocation of parental responsibilities, including decision-making, under § 14–10–123(1)(c).

Accordingly, the trial court properly dismissed grandmother's petition.

The court's orders are affirmed.

Judge DAILEY and Judge WEBB concur.