2012 COA 142

**In re the Parental Responsibilities of D.T., a Child, and Concerning Crystal Lavattiata, Appellant,**

and

**Christina Trujillo, Appellee.**

**No. 11CA1006.**

Colorado Court of Appeals, Div. II.

Aug. 30, 2012.

Rehearing Denied Nov. 1, 2011.

Hall & Evans, L.L.C., Alan Epstein, Conor P. Boyle, Jessie L. Pellant, Denver, Colorado, for Appellant.

Baker & Hostetler LLP, Katayoun A. Donnelly, Denver, Colorado, for Appellee.

Opinion by Judge GRAHAM.

¶ 1 Crystal Lavattiata (C.L.) appeals from the judgment dismissing her petition for parental responsibilities for the child (D.T.) of

Christina Trujillo (mother). We affirm and remand for determination of mother's section 14–10–119, C.R.S.2011, attorney fee request.

## I. Background

¶ 2 Mother and C.L. became acquainted when mother was a teenager and attended school with C.L.'s children. After mother gave birth to D.T. in 2003, she moved into C.L.'s home, and C.L. assisted her in caring for the child. Although mother moved out of C.L.'s home when D.T. was six months old, C.L. continued to assist mother with D.T.'s care until 2010, when mother ended C.L.'s time with him. C.L. subsequently petitioned for an allocation of parental responsibilities, and a hearing was held to determine whether C.L. had standing under section 14–10–123(1)(c), C.R.S.2011.

¶ 3 At the hearing, C.L. testified that until the month before she petitioned for parental responsibilities, she was regularly providing physical care for D.T. in her home three to five overnights a week. Mother testified, however, that there was no set schedule for C.L.'s care of D.T. and that C.L. typically had the child one or two overnights a week when mother wanted to go out or had to work late, and occasional additional overnights as needed. C.L. further testified that she acted in a parental, as opposed to a grandmother or babysitter, role for D.T. because she was not paid to take care of him, and provided for all of his needs when he was with her, including a bedroom, food, clothing, toys, and activities, and made all decisions concerning his care. Mother testified, however, that C.L. was merely one of many friends and family members who helped mother, because she was a single mother, with D.T.'s care, and that mother continuously monitored and directed C.L.'s care of D.T. Both parties presented numerous witnesses to corroborate their accounts of the nature and frequency of C.L.'s care of D.T.

¶ 4 The trial court found that C.L. served more of a grandmotherly role, rather than a parental role, for D.T., and that mother did not cede her parental rights, but rather consistently directed and supervised C.L.'s care of D.T. Thus, the court concluded that C.L. did not have standing under section 14–10–123(1)(c), and dismissed C.L.'s petition. C.L.'s appeal followed.

## II. Nonparent Standing

■ ¶ 5 C.L. contends that the trial court erred by dismissing her petition for parental responsibilities. We disagree.

■ ¶ 6 We review de novo the trial court's construction of section 14–10–123(1)(c), and its legal determination whether C.L. has standing thereunder. *See In Interest of B.B.O.*, 2012 CO 40, ¶ 6, 277 P.3d 818; *In re Parental Responsibilities of E.S.*, 264 P.3d 623, 625 (Colo.App.2011). We defer to the court's factual findings, however, if they are supported by the record. *See In re Parental Responsibilities of B.J.*, 242 P.3d 1128, 1132 (Colo.2010).

¶ 7 Standing to seek an allocation of parental responsibilities is governed by section 14–10–123(1), C.R.S.2011. As relevant here, a nonparent can attain standing under section 14–10–123(1)(c) if the nonparent has had the physical care of the child for six months or more and commences an action seeking parental responsibilities within six months of the termination of such care. Thus, whether a nonparent has standing under this section turns on who has or recently had "physical care" of the child. *See B.B.O.*, ¶ 9; *see also In Interest of L.F.*, 121 P.3d 267, 270–71 (Colo.App.2005).

¶ 8 The term "physical care" is not defined in the statute. The Colorado Supreme Court recently relied on the plain and ordinary meaning of "care" of a child as "responsibility for or attention to safety and well[-]being." *B.B.O.*, ¶ 9 (quoting *Webster's Third New International Dictionary* 338 (2002)). The court further recognized that the term "physical care" factors in both the amount of time a child has spent in the physical control of the nonparent and the psychological bonds that may have formed as a result. *Id.* at ¶ 18; *see also In re Custody of C.C.R.S.*, 892 P.2d 246, 253 (Colo.1995) (interpreting previous version of the statute using "physical custody" rather than "physical care"); *In Interest of E.L.M.C.*, 100 P.3d 546, 553 (Colo.App.2004).

¶ 9 A nonparent who meets the six-month physical care requirement in the statute may attain standing even if the child's parents have also retained some contact with and care of the child. *See L.F.*, 121 P.3d at 273; *E.L.M.C.*, 100 P.3d at 555. However, a nonparent who serves a role similar to a babysitter or nanny, and provides care under the direction and supervision of the child's parent, does not have standing under section 14–10–123(1)(c). *See E.S.*, 264 P.3d at 626; *In Interest of C.T.G.*, 179 P.3d 213, 220 (Colo. App.2007); *see also L.F.*, 121 P.3d at 273 ("[T]he General Assembly did not intend that the term 'physical care' grant temporary caregivers standing to seek allocation of parental responsibilities when their care is subject to the continuing direction and discretion of the child's parents."); *cf. C.C.R.S.*, 892 P.2d at 253 (comparing cases from other jurisdictions, in which babysitters or temporary caregivers were determined not to have "physical custody" of a child, with case of the prospective adoptive parents at issue, who had total care of the child with the intention that they would ultimately adopt the child).

¶ 10 Accordingly, when determining whether a nonparent, who shares physical care of a child with a parent, has standing under section 14–10–123(1)(c), a court considers the nature, frequency, and duration of the contacts between the child and nonparent and between the child and parent. *See E.S.*, 264 P.3d at 625; *L.F.*, 121 P.3d at 270; *In re V.R.P.F.*, 939 P.2d 512, 514 (Colo.App.1997); *see also E.L.M.C.*, 100 P.3d at 554 (recognizing that nonparent standing turns on the quality of the relationship between the nonparent and the child).

¶ 11 For example, in *E.L.M.C.*, the partner of a child's adoptive mother was determined to have standing when she had lived with and supported the child, as a co-parent with the child's mother. *See* 100 P.3d at 553–55. In contrast, a child's grandmother, who provided physical care for the child three to four days a week under the direction and control of the child's parents while the child's mother was recovering from illness, did not have standing. *See L.F.*, 121 P.3d at 273.

¶ 12 Applying these authorities to the present case, we agree with the trial court that the nature and frequency of C.L.'s care of D.T. was not sufficient to grant C.L. standing under section 14–10–123(1)(c), and further conclude that the Colorado Supreme Court's recent decision in *B.B.O.* does not compel a different result under the facts involved here.

### A. The Nature and Frequency of C.L.'s Care of D.T.

¶ 13 The record supports the trial court's findings that C.L. functioned in a grandmother-like role to D.T., and provided care for D.T. at mother's direction and under her supervision.

¶ 14 Mother and her witnesses testified that D.T. was under mother's physical care most of the time, and that C.L. helped mother and was a grandmother-like figure to D.T. Mother's sister and a friend testified that they also helped mother care for D.T., and that mother did not pay them for doing so.

¶ 15 C.L. testified that mother chose the child's day care provider and attended parent-teacher conferences, and that C.L. was not authorized to take D.T. to the doctor, but she accompanied and supported mother when mother took the child to the doctor. C.L. further testified that she and mother "discussed almost everything" about D.T.'s care, that mother would call when C.L. was caring for D.T., and that C.L. would call mother when D.T. was ill, and when she or others took him on outings.

¶ 16 Mother further testified that she directed C.L.'s care of D.T., and she provided several specific examples of such direction, which C.L. corroborated, including (1) that D.T. should stop sleeping in C.L.'s bed; (2) that D.T. could be left alone in the bathroom when he bathed; (3) that C.L. should stop buying D.T. expensive toys; and (4) that C.L. should not permit D.T. to use a lighter to light candles by himself. Both mother and C.L. testified that after they had several discussions concerning these and other child-rearing issues, mother first reduced the amount of time that D.T. spent with C.L., and then eliminated it completely.

¶ 17 We acknowledge that C.L. presented evidence that conflicted in part with mother's account, principally concerning the

amount of time that C.L. cared for D.T., which she and her witnesses testified averaged three to five overnights a week and included holiday time, and concerning C.L.'s role in supervising D.T.'s schoolwork and disciplining him without mother's involvement. It is the trial court's role to evaluate the credibility of witnesses and resolve factual conflicts in the evidence, however, and we are bound by the court's factual findings unless they are clearly erroneous and not supported by the evidence. *See In re Marriage of Bowles*, 916 P.2d 615, 617 (Colo.App. 1995).

¶ 18 Here, consistent with the trial court's findings, the totality of the evidence reflects that mother at all times acted as D.T.'s parent and directed his care, whereas C.L. served as a mentor to mother and a grandmother-like figure to D.T. We agree with the trial court that mother, as a young, inexperienced single mother, did not cede parental authority by seeking out C.L.'s help and advice on parenting matters, or by accepting C.L.'s willingness to help mother care for D.T.

¶ 19 Rather, the evidence reflects that mother remained in control of D.T.'s care by continuously monitoring and directing C.L.'s actions with D.T., and then terminating C.L.'s care of the child when C.L. refused to follow her directions. In other words, mother was ultimately responsible for D.T.'s safety and well-being, even when he was being cared for by others, including C.L. *See B.B.O.*, at ¶ 9. Thus, the trial court did not err in concluding that C.L. lacked standing under section 14–10–123(1)(c).

¶ 20 We are not persuaded otherwise by C.L.'s contention that the trial court erred by finding that a nonparent must always be a psychological parent in order to attain standing under the statute. Here, the court did not rely solely on C.L.'s lack of psychological parent status in ruling that C.L. lacked standing. Rather, the court relied primarily on the fact that mother continued to act as D.T.'s parent by directing and controlling C.L.'s care of D.T. Accordingly, even if the court erred, any error was harmless, and we need not decide here whether a nonparent must prove psychological parent status in

order to meet the physical care requirement under section 14–10–123(1)(c). *See, e.g., L.F.*, 121 P.3d at 272–73 (trial court's error, if any, in stating that nonparent must be given unilateral decision-making authority in order to meet physical care requirement was harmless when court also found that nonparent's care was at the discretion and control of the parents). Because under the facts here, C.L. did not have the necessary "physical care" of D.T. under section 14–10–123(1)(c), C.L. lacked standing, regardless of whether or not she met the definition of a "psychological parent."

¶ 21 Because we affirm the trial court's conclusion that C.L. did not have the requisite physical care of D.T. to attain standing under the statute, we need not address mother's contention that even if C.L. had physical care of D.T., she did not file for parental responsibilities within six months of the termination of such care.

## B. *B.B.O.*

¶ 22 The Colorado Supreme Court's decision in *B.B.O.*, 2012 CO 40, 277 P.3d 818, does not compel a different result under the facts involved here.

¶ 23 In *B.B.O.*, a child's adult half-sister petitioned for parental responsibilities under section 14–10–123(1)(b) and (c), C.R.S.2011, after the child's father and primary residential parent died. *B.B.O.*, ¶¶ 3–4. The sister had been assisting the father in caring for the child for six years with very little involvement by the child's mother, who lived in another state and had not seen the child for several years. *Id.* The court held that the sister had standing under section 14–10–123(1)(b) because the child was not under the care of either parent. *B.B.O.*, ¶ 19. The court further held that it is not necessary, for the purposes of standing under section 14–10–123(1)(b) or (c), that a nonparent establish that the child's parent consented to the nonparent's care of the child. *B.B.O.*, ¶¶ 17, 20.

¶ 24 Here, the trial court did not have the benefit of the *B.B.O.* decision, and thus noted, consistent with previous authorities from this court, that parental consent to a nonparent's care *is* necessary for a nonparent to

establish standing under section 14–10–123(1)(c). The court's statement does not compel reversal here, however, because parental consent is not the determinative issue. Rather, the issue here is whether C.L.'s care of D.T. under the direction of mother can confer standing under the statute. There is no dispute that mother *consented* to C.L.'s care of D.T. Thus, the present case is distinguishable from the situation in *B.B.O.*, where the mother contended that she never consented to the sister providing care for the child alone after the father died. *See B.B.O.*, ¶ 5.

¶ 25 Further, in *B.B.O.*, unlike in the present case, there was no question that, at the time the sister petitioned for parental responsibilities, she was providing *all* of the child's physical care, exclusive of the mother. *See id.* at ¶¶ 4, 19. Thus, the sister had standing under section 14–10–123(1)(b), and the nature of her care as compared to the concurrent care being provided by a parent was not at issue in the case. Accordingly, *B.B.O.* does not compel a different result under the circumstances involved here.

### III. Attorney Fees

¶ 26 Mother requests her attorney fees incurred on appeal under section 14–10–119. Under this statute, attorney fees may be apportioned in domestic relations cases between the parties based on relative ability to pay. *See In re Marriage of Gutfreund*, 148 P.3d 136, 141 (Colo.2006); *see also In Interest of K.M.B.*, 80 P.3d 914, 917 (Colo. App.2003) (section 14–10–119 fees may be awarded in nonparent parental responsibility actions). Appellate fees may be sought under the statute even if fees were not requested in the trial court. *In re Marriage of Williamson*, 205 P.3d 538, 543 (Colo.App. 2009).

¶ 27 We reject C.L.'s argument that mother did not state a sufficient legal basis for an attorney fee award. Rather, mother cited section 14–10–119 and case law thereunder concerning the standards for fee awards under the statute, including for the services of a pro bono attorney. C.L. cites no authority prohibiting a fee recovery against a party who is also receiving pro bono representation, and we will not deny mother's request on that basis. *See Schempp v. Lucre Mgmt. Grp., LLC*, 75 P.3d 1157, 1161 (Colo.App. 2003) (declining to consider issue for which no supporting legal authority was provided); *see also In re Marriage of Swink*, 807 P.2d 1245, 1248 (Colo.App.1991) ("§ 14–10–119 is sufficiently broad to allow the court to enter an order requiring a party to pay a reasonable sum for legal services rendered to the other party by a *pro bono* attorney in dissolution of marriage proceedings."). Rather, because the trial court is better equipped to determine issues of fact regarding the parties' current relative financial resources, we remand mother's request to the trial court for determination. *See* C.A.R. 39.5; *Williamson*, 205 P.3d at 543.

¶ 28 The judgment is affirmed and the case is remanded for determination of mother's appellate attorney fee request.

Judge STERNBERG* and Judge NEY* concur.