20CA1525 Parental Resp Conc CRD 11-10-2021 COLORADO COURT OF APPEALS Court of Appeals Nos. 20CA1525 & 20CA1774 Larimer County District Court Nos. 10JV7 & 19DR275 Honorable Gregory M. Lammons, Judge In re the Parental Responsibilities Concerning C.R.D., a Child, and Concerning Christopher Keller, Appellee, and Juliane Dawson, Appellant. ORDERS AFFIRMED AND APPEAL DISMISSED IN PART Division VII Opinion by JUDGE GROVE Navarro and Pawar, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced November 10, 2021 No Appearance for Appellee Juliane Dawson, Pro Se 
1 ¶ 1 In this post-decree allocation of parental responsibilities case, Juliane Dawson (mother) appeals the district court orders that (1) modified the parties’ payment procedures for extracurricular activities; (2) imposed a punitive contempt sanction against mother; and (3) imposed a punitive contempt sanction against Christopher Keller (father). We affirm the first two orders and, to the extent that mother requests we review father’s contempt sanction, dismiss that portion of mother’s appeal. I. Extracurricular Activities Order A. Relevant Facts ¶ 2 In 2010, the parties executed an agreement for the allocation of parental responsibilities concerning their child, C.R.D. As relevant here, the parties agreed that mother could enroll the child in two extracurricular activities at a time and that each party would pay half of the activities’ costs directly to the organization sponsoring the activity. The district court incorporated the parties’ agreement in its allocation of parental responsibilities order. ¶ 3 In 2015, the parties began fighting over each other’s compliance with the order on extracurricular activities, including disputes concerning father’s payment for the child’s extracurricular 
2 activities and mother’s notifications about the activities. During their continuous litigation, the court reaffirmed the parties’ obligation to share the costs for the child’s two extracurricular activities and required mother to provide father with specific information concerning the child’s activities, including registration and payment information for each sponsoring organization. In 2017 and 2018, the court twice found father in contempt for not paying his share of the extracurricular activities’ expenses, and it imposed a jail sentence as a punitive sanction. ¶ 4 In 2020, father filed a motion for contempt against mother, alleging that she had not complied with the notification requirements under the extracurricular activities order. In addition to addressing the contempt motion, the court notified the parties that it was considering a change to the payment and notification provisions under the extracurricular activities order to reduce the conflict between them. It invited the parties to present evidence on how the order should be modified. ¶ 5 After a hearing, the district court denied father’s contempt motion, but it issued an order that modified the payment and notification provisions for extracurricular activities. In particular, 
3 the court ordered father to pay mother $600 per year for his share of the costs, and it ordered mother to provide father with information on when and where the child had activities. ¶ 6 Mother then filed a motion for the court to clarify its authority to modify the order on extracurricular activities and a motion to reconsider its ruling. The court denied both motions. B. Standard of Review ¶ 7 Expenses for extracurricular activities may be included in a parent’s child support obligation. See In re Marriage of West, 94 P.3d 1248, 1252 (Colo. App. 2004); In re Marriage of Laughlin, 932 P.2d 858, 862 (Colo. App. 1997). ¶ 8 We review orders on child support for an abuse of discretion. In re Marriage of Davis, 252 P.3d 530, 533 (Colo. App. 2011). A court abuses its discretion when its decision is manifestly arbitrary, unfair, or unreasonable, or a misapplication of the law. In re Marriage of Herold, 2021 COA 16, ¶ 5. We accept the court’s factual findings unless they are clearly erroneous and review de novo its application of the law. See In re Marriage of Connerton, 260 P.3d 62, 66 (Colo. App. 2010); In re Marriage of Atencio, 47 P.3d 718, 720 (Colo. App. 2002). 
4 C. The District Court’s Authority ¶ 9 Mother contends that the district court lacked the legal authority to change the parties’ “[s]tipulation” on payments for extracurricular activities. We disagree. ¶ 10 “It is well established that a court retains continuing jurisdiction over the support of minor children,” including the authority to modify its orders for support. In re Marriage of Chalat, 112 P.3d 47, 53 (Colo. 2005); see also In re Marriage of Rivera, 91 P.3d 464, 466 (Colo. App. 2004) (noting that a court has “equitable authority to set aside or reduce a support judgment in circumstances that would render its enforcement fundamentally unfair or unjust”). ¶ 11 Mother, however, argues that the court’s authority did not extend to the child’s extracurricular activities because the support for those activities was initially determined by the parties’ pre-
decree agreement. But the court incorporated that agreement into its final order on the allocation of parental responsibilities. It therefore was the allocation of parental responsibilities order, not the parties’ agreement, that was the enforceable decree. Cf. § 14-
10-112(5), C.R.S. 2021 (recognizing that the terms of a separation 
5 agreement incorporated into the decree are enforceable as a judgment). And the court had the authority to modify that order, including the provision regarding payments for the child’s extracurricular activities. See Chalat, 112 P.3d at 53. ¶ 12 Mother also argues that the court failed to give her notice of its intent to change the amount of father’s payment for the child’s extracurricular activities. But before the hearing, the court specifically put mother “on notice” about changing the provisions on extracurricular activities, informing her that it was considering “changing the order regarding extracurricular activities, and the payment and notifications on them.” And at the hearing, the court directly asked mother about placing a “limit” on the amount of extracurricular activities’ costs. Thus, the record reveals that the court made mother aware it was considering a change to father’s payments for extracurricular activities, and mother directs us to no authority that the court was required to do more. See Biel v. Alcott, 876 P.2d 60, 64 (Colo. App. 1993) (“An appealing party bears the burden to provide supporting authority for contentions of error asserted on appeal, and a failure to do so will result in an affirmation of the judgment.”). 
6 D. The District Court Acted Within Its Discretion ¶ 13 We also reject mother’s argument that the court’s modification of the provisions for extracurricular activities was an abuse of discretion. ¶ 14 As the district court recognized, extracurricular activities have been a continuous source of conflict between the parties over the course of this highly litigious case. The court thus sought to minimize the conflict by simplifying the way father paid the expenses. The court also simplified mother’s notification requirements. ¶ 15 Given the history of the case, we are not persuaded that the court’s modification was an abuse of discretion. The modified procedures streamlined the mechanics for extracurricular activities, reducing the potential for conflict between the parties. And lessening the parents’ conflict promotes the child’s best interests. See § 14-10-124(1.5)(a)(III), (VI), (VII), C.R.S. 2021; People v. Martinez, 70 P.3d 474, 478 (Colo. 2003) (recognizing that child support should serve the child’s best interests). While mother contends that the modification rewards father, focusing on his past failure to pay his share of the costs, she neglects her role in the 
7 disputes that arose, including her history of notifying father of the activities, which father argued impacted his payments. ¶ 16 Mother also argues that $600 per year for father’s share of the extracurricular activities costs was unreasonably low. The parties presented conflicting evidence on this point. Father testified that he spent “$360” per year. Mother testified that she had spent “$895” per year and indicated that, since the expenses were increasing, “$250” per month (or $3,000 per year) was a logical amount for father’s share. The court found father’s estimated amount unreasonably low and mother’s requested amount unreasonably high. It then resolved the conflicting evidence by determining that a reasonable amount for father’s share of the expenses fell somewhere in the middle. ¶ 17 While mother points to evidence that could support a higher amount for father’s share of the expenses, it was the district court’s role to resolve the conflicts in the evidence, determine the credibility of witnesses, weigh testimony, and draw inferences from the evidence. See In re Estate of Owens, 2017 COA 53, ¶ 22. Given the conflicting evidence, $600 per year for father’s share of the child’s extracurricular activities’ costs was not manifestly unreasonable. 
8 ¶ 18 To the extent mother also suggests that the court erred by denying her motions for clarification and reconsideration of the extracurricular activities order, she develops no specific argument in support of that suggestion beyond the arguments rejected above. See Biel, 876 P.2d at 64. ¶ 19 The district court therefore did not abuse its discretion by modifying the payment provisions for the child’s extracurricular activities. II. Mother’s Punitive Contempt Sanction A. Relevant Facts ¶ 20 Beginning early in this case, father alleged that mother was sending him inappropriate communications. After these early disputes, the court ordered that “[a]ll communications are to be free [from] any degrading or inflammatory remarks[, which] includes any reference to the ability of [a] party to parent the child or the status of either parties’ mental health.” ¶ 21 Following this communication order, father filed numerous contempt motions, alleging that mother had sent him degrading and inflammatory emails. The court denied some of these contempt motions, but, in 2018, it concluded that three of mother’s emails 
9 were inflammatory and in willful violation of the communication order. The court explained that mother’s comments in these emails degraded father’s parenting abilities, were unnecessarily accusatory, and were made to incite conflict. The court imposed a punitive sanction of two days in jail for each email that it found violated its order. ¶ 22 In 2020, father again sought contempt sanctions against mother, alleging that she had sent him over two dozen degrading and inflammatory emails from September 2019 to February 2020. ¶ 23 After a hearing, the district court found that mother willfully violated the communication order in eleven of the emails by making comments that were accusatory and demeaning of father’s ability to parent the child. Specifically, the court found that mother’s comments unnecessarily accused father of committing crimes, stealing money from her, manipulating the court, lying under oath, lying to the child, engaging in conduct that harmed the child, sabotaging the child’s activities, and neglecting the child’s needs. The court imposed a punitive sanction of fifteen days in jail. 
10 B. Governing Legal Standards ¶ 24 A court may hold a party in contempt for “disobedience or resistance” to a lawful court order. C.R.C.P. 107(a)(1); see Davis, 252 P.3d at 537. The court may impose punitive sanctions for a party’s contempt. In re Marriage of Cyr, 186 P.3d 88, 91-92 (Colo. App. 2008). Punitive sanctions are criminal in nature and are designed to punish the contemnor for conduct offensive to the authority and dignity of the court. Id. at 91. ¶ 25 Punitive sanctions must be supported by proof beyond a reasonable doubt that (1) a lawful court order existed; (2) the contemnor knew of the order; (3) the contemnor had the ability to comply with the order; and (4) the contemnor willfully refused to comply with the order. In re Marriage of Nussbeck, 974 P.2d 493, 497 (Colo. 1999). ¶ 26 “The decision whether to find a party in contempt is within the sound discretion of the [district] court and will not be reversed on appeal absent an abuse of discretion.” Davis, 252 P.3d at 537. We must accept the district court’s factual determinations as to contempt unless they have no record support. In re Marriage of Webb, 284 P.3d 107, 108-09 (Colo. App. 2011). 
11 C. Inflammatory Emails ¶ 27 Mother contends that the court’s finding of punitive contempt cannot stand because the communication order was vague and, historically, the court had not found emails that she claims are similar to those at issue here to be inflammatory. She argues that, as a result, (1) the communication order was not lawful; (2) she did not have the ability to comply with the order; and (3) she did not willfully refuse to comply with the order. We discern no error. 1. Lawful Court Order and Mother’s Ability to Comply ¶ 28 We first decline to address mother’s arguments, raised for the first time on appeal, that a lawful court order did not exist and that she did not have the ability to comply with the order. Mother never argued to the district court that the communication order was unlawful or that she lacked the ability to comply with it. Rather, in her closing argument, conceding that the court had already found that there was a lawful order, that mother knew of it, and that mother had the “ability to comply with the order,” mother’s attorney argued only the question of “[w]hether the respondent willfully refused to comply with the order.” Mother thus waived her opportunity to challenge these issues now. See In re Marriage of 
12 Ensminger, 209 P.3d 1163, 1167 (Colo. App. 2008) (“Arguments not presented at trial cannot be raised for the first time on appeal.”); see also People in Interest of R.L., 961 P.2d 606, 608 (Colo. App. 1998) (recognizing that the parties may not take a position on appeal contrary to their position to the trial court). 2. Willful Refusal to Comply ¶ 29 We next reject mother’s argument that she did not willfully refuse to comply with the order because she had no reasonable way to know what communication would be considered inflammatory. ¶ 30 An act is willful when it is done “voluntarily, knowingly, and with conscious regard for the consequences of [one’s] conduct.” Nussbeck, 974 P.2d at 499. ¶ 31 The communication order fairly described the communications that mother could not send. See Z.J. Gifts D-2, L.L.C. v. City of Aurora, 93 P.3d 633, 639 (Colo. App. 2004) (providing that a court order must be sufficiently precise to enable the parties subject to the order to conform their conduct to it); cf. People v. Shell, 148 P.3d 162, 172 (Colo. 2006) (recognizing that a law is not vague when it fairly describes the forbidden conduct, and persons of common intelligence readily understand its meaning). Specifically, 
13 it required that all communications were to be free of “any degrading or inflammatory remarks[, which] includes any reference to the ability of [a] party to parent the child or the status of either parties’ mental health.” ¶ 32 While mother asserts that she did not know what language would be considered inflammatory, in the context here, “inflammatory” plainly means language that tends to anger or upset. See Webster’s Third New International Dictionary 1159 (2002) (defining inflammatory as “tending to excite anger, animosity, disorder, or tumult”); Black’s Law Dictionary 931 (11th ed. 2019) (defining inflammatory as “[t]ending to cause strong feelings of anger, indignation, or other type of upset; tending to stir the passions.”); see also Owners Ins. Co. v. Dakota Station II Condo. Ass’n, 2019 CO 65, ¶ 32 (recognizing that we may consider the dictionary definition when determining the plain and ordinary meaning of a word). The order further clarified that any comments about father’s ability to parent the child were not allowed. ¶ 33 In violation of this plain directive, mother sent multiple emails to father in which she made unnecessary comments that degraded his parenting and made inflammatory accusations that he had 
14 committed crimes against her and the court, repeatedly lied to the child, and was sabotaging the child. What is more, mother’s other comments in the emails suggest that she knew her remarks could be viewed as inflammatory because she attempted to disclaim any violation of the communication order by stating that she was “not trying to inflame anything,” not saying anything “inflammatory or derogatory,” and not commenting on father’s “ABILITY to parent” the child. ¶ 34 Nor are we persuaded by mother’s argument that “the history of conflicting” orders concerning her previous emails prevented her from knowing what type of communications were inflammatory. Before the current contempt hearing, father had filed numerous contempt motions based on mother’s inflammatory emails. Although the court found some of these past communications were not inflammatory, it did not deny all of father’s contempt motions. By holding mother in contempt in 2018, the court directly informed her that comments that were accusatory and demeaning of father’s ability to parent the child were inflammatory and not allowed under the communication order. Despite this notice, mother’s emails to father continued to include such inappropriate comments. Indeed, 
15 similar to the emails from the 2018 contempt, mother’s present emails included unnecessary accusations and critiques of father’s parenting abilities. In addition, even after father filed the present contempt motions, which notified mother that he believed her present communications were inflammatory, mother persisted with her inappropriate comments. ¶ 35 To be sure, mother argues that her comments were benign and justified. But the district court rejected her characterization, and it was for the district court to resolve that factual conflict. See Owens, ¶ 22. Moreover, the court rejected mother’s claim that she could not discern when her communications were inflammatory. The court found that mother lacked credibility, and we must defer to that finding. See In re Parental Responsibilities Concerning D.T., 2012 COA 142, ¶ 17. ¶ 36 The record therefore supports the court’s finding that mother knew her communications were inflammatory and that she willfully refused to comply with the communication order. See Webb, 284 P.3d at 108-09. ¶ 37 To the extent mother also asserts that father did not properly serve her with the contempt citation, she did not raise this issue to 
16 the district court and develops no argument in support of her assertion now. See Ensminger, 209 P.3d at1167; Biel, 876 P.2d at 64. Therefore, we do not further consider her assertion. D. Jail Sentence ¶ 38 Mother contends that the district court “showed extreme bias” in sentencing her to fifteen days in jail as a punitive contempt sanction, arguing that her sentence was excessive when compared to the punitive sanction imposed against father for his contempt a few months later. We disagree. ¶ 39 “Punishment imposed for contempt should be reasonable or reasonably commensurate with the offense committed.” People v. Mulberry, 919 P.2d 835, 837 (Colo. App. 1995). In determining the punishment to be imposed, the court should take into consideration the surrounding facts and circumstances. See Shotkin v. Atchison, T. & S. F. R. Co., 124 Colo. 141, 146, 235 P.2d 990, 993 (1951). ¶ 40 At mother’s sentencing hearing, the court found that this case was “truly an outlier in its litigiousness, and the unreasonable behavior that’s gone on.” It continued that mother “clearly . . . intended to be inflammatory over and over and over again” but she took “zero responsibility for her actions, absolutely none.” The 
17 court noted further that even though mother had previously been found in contempt for the exact same conduct — and briefly jailed as a consequence — her contemptuous conduct did not stop. Given this history, the court determined that a more substantial punitive sanction was warranted. ¶ 41 After imposing mother’s contempt sanction, the court found that father had violated (1) the order for extracurricular activities (prior to the court’s modification) by not paying his share of the expenses and (2) the parenting time order by not taking the child to two extracurricular activities. For father’s contempt, the court imposed a punitive sanction that required him to pay a fine of $350 and complete ten hours of useful public service. ¶ 42 Although father’s sanction was less severe, we are not persuaded that mother’s sanction of fifteen days in jail was excessive or an abuse of the court’s discretion. The court considered mother’s continued and persistent conduct in violation of the communication order, the previous punitive sanction for her past inflammatory emails that had not deterred her inappropriate communications, and her refusal to now take responsibility for her actions. See Shotkin, 124 Colo. at 146, 235 P.2d at 993. In 
18 addition, the court found that, unlike mother, father had partially mitigated his contempt by paying his outstanding extracurricular activities’ costs before his sentencing. And the court considered this mitigation when imposing father’s sanction. ¶ 43 While mother argues that the court did not offer her an opportunity to mitigate her contempt, we do not agree. The court allowed her to submit a mitigation statement, and provided her, as well as her attorney, an opportunity to supplement that statement at the sentencing hearing. See C.R.C.P. 107(d)(1). The fact that the court found that she had not mitigated her conduct does not mean she was denied an opportunity to do so. ¶ 44 Still, mother contends that the district court judge was biased against her. To support her contention, mother relies on the disparity in the parties’ sentences and other adverse rulings. However, the court’s sentences were based on the facts and circumstances of each party’s contempt, and the court’s rulings against mother, without more, do not establish judicial bias. See In re Marriage of McSoud, 131 P.3d 1208, 1223 (Colo. App. 2006); cf. People in Interest of S.G., 91 P.3d 443, 447 (Colo. App. 2004) (“[A] judge’s opinion formed against a party from evidence before the 
19 court in a judicial proceeding . . . is generally not a basis for disqualification.”). To the extent mother generally asserts that the court used a hostile tone toward her during the contempt hearing, she did not raise that contention before the district court, and we find nothing in the record supporting her assertion. See In re Marriage of Zebedee, 778 P.2d 694, 699 (Colo. App. 1988) (declining to consider allegations of judicial bias not raised to the district court). ¶ 45 The district court’s punitive contempt sanction against mother, therefore, was not an abuse of discretion. III. Father’s Punitive Contempt Sanction ¶ 46 Mother also appears to appeal the district court’s order that imposed ten hours of useful public service as a punitive contempt sanction against father for not taking the child to his extracurricular activities. She argues that the court erred because C.R.C.P. 107(d)(1) does not authorize the court to impose public service as a punitive sanction. We conclude that mother lacks standing to appeal father’s punitive sanction and dismiss this portion of her appeal. 
20 ¶ 47 Standing is a threshold issue involving the court’s subject matter jurisdiction. Owens, ¶ 8. A party’s standing to pursue an action “requires that [the] individual ‘maintain a “personal stake” in the outcome of the litigation throughout its course.’” In Interest of C.T.G., 179 P.3d 213, 215 (Colo. App. 2007) (quoting Gollust v. Mendell, 501 U.S. 115, 126 (1991)). ¶ 48 A punitive sanction punishes the contemnor for conduct offensive to the authority and dignity of the court. Nussbeck, 974 P.2d at 499; see also C.R.C.P. 107(a)(4), (d)(1). Unlike a remedial contempt sanction, a punitive contempt sanction is not designed to benefit the interests of a third party. Nussbeck, 974 P.2d at 499. Thus, “a punitive contempt proceeding is a matter between the court and the offending party.” Id.; see also In re Pechnick, 128 Colo. 177, 182, 261 P.2d 504, 507 (1953). ¶ 49 Mother sought, and the court imposed, punitive sanctions against father. Those sanctions do not implicate mother’s rights, and, thus, she lacks standing to appeal that order. See C.T.G., 179 P.3d at 215. We dismiss this portion of her appeal. 
21 IV. Conclusion ¶ 50 We affirm the district court’s orders that modified the payment arrangements for the child’s extracurricular activities and imposed a punitive contempt sanction against mother. We dismiss the portion of mother’s appeal challenging father’s punitive contempt sanction. JUDGE NAVARRO and JUDGE PAWAR concur.